## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-_____

MICHAEL CRUZ,

Plaintiff,

v.

FARMERS INSURANCE EXCHANGE, TRUCK INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, MID-CENTURY INSURANCE COMPANY, and FARMERS NEW WORLD LIFE INSURANCE COMPANY,

Defendants.

---

PLAINTIFF'S COMPLAINT WITH DEMAND FOR JURY TRIAL

---

Plaintiff, Michael "Mike" Cruz, by and through his attorney, Ralph Lamar, files this his Complaint, and respectfully alleges as follows:

## I. NATURE OF THE CASE

1. This discrimination action is brought against Defendants Farmers Insurance Exchange, Truck Insurance Exchange, Mid-Century Insurance Company, and Farmers New World Life Insurance Company, known collectively as "Farmers Insurance Company", by Plaintiff Michael Cruz for equitable relief and monetary damages to redress the deprivation of civil rights secured to him by 42 U.S.C. § 1981 and Colorado's Anti-Discrimination Act, C.R.S. § 24-34-401, *et seq.* (hereinafter referred to as "CADA").

Specifically, he alleges that Defendants terminated his contract to provide insurance services and/or fired him from his position as an insurance agent because of his race in violation of 42 U.S.C. § 1981 and CADA. Mr. Cruz alleges that the Defendants' actions caused him to suffer economic losses through loss of employment, and mental distress and humiliation. He

1

seeks an award of lost pay, compensatory damages, punitive damages, and attorneys' fees and costs of this action and seeks equitable relief in the form of an order of reinstatement or an award of front pay.

## II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the claim for a violation of 42 U.S.C. § 1981 (Count I) under 28 U.S.C. §§ 1331 because it arises under the laws of the United States. Count II for a violation of state law is brought pursuant to this Court's supplemental jurisdiction.

3. Venue is proper in this judicial District under 28 U.SC. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendant has offices, conducts business, and can be found in this District, and the causes of action arose and the acts and omissions complained of occurred therein.

## III. PARTIES

4. Plaintiff Michael "Mike" Cruz is a citizen of the U.S. currently residing in Greeley, CO and is subject to the jurisdiction of this court.

5. Defendants were the employer who terminated plaintiff's employment and/or the entity with which he had a contract to perform services and which party ended the agreement for plaintiff to provide it with services. Defendants' offices are located at 1528 N. Lincoln Ave., Suite 2, in Loveland, CO. Defendant is therefore subject to the jurisdiction of this court.

## IV. ADMINISTRATIVE EXHAUSTION

6. On or about April 11, 2018 plaintiff filed a charge of discrimination with the CCRD in which he alleged that his termination by Defendants was on the basis of his race, hispanic.

**V.      STATEMENT OF FACTS**

7.      Mike Cruz is a 64 year old Hispanic male of Mexican-American heritage.

8.      Plaintiff first started working for Defendant Farmers as an insurance agent on February 15, 1984.

9.      Defendant obtained an insurance agency with Defendant in February of 1985.

9.      Cruz enjoyed significant success as an agent for Defendant almost right from the start.

10.     Cruz won numerous awards from the company over the years including:

- Top Producer All Lines in 1985, 1986, 1987, 1988, 1989, and 1997
- Agent of the Quarter 1988, 1990, 1991, and 1992
- Order of the Blue Max Vase 1986 and 1987
- Life Champion 1988
- Commercial Champion Producer for 1993
- Top Auto Production 1991
- District Agent of the Year 1988 and 1991
- Homeowners Champion of the Year 1990 and 1991
- Agency of the Quarter for the Entire State of Colorado 1991
- Life Top Producer 1986, 1990 and 1996
- Toppers Club 1990
- Top Producing Commercial Champion 1989
- Agent of the Year 1989
- Top Producer Life 1993
- Top Auto Producing Champion 1990

3

- Top Auto Sales Production 1992
- Top Fire Production 1992
- Top Life Producer 1993
- Century Club 1990
- Millionaire Club 1991
- Top Life Producer 1994

11. In early 2017 Cruz received acknowledgement of 30 years of service with the company.

12. On or about January 17, 2017, Dan French called plaintiff's insurance agency and began to harangue plaintiff using profanity and loudly complaining about Farmers' long-term continued practice of sending uninvited promotional materials to his home. French did not identify himself in this conversation in spite of Cruz' repeated requests for the caller to identify himself.

13. The promotional materials were not sent to French by plaintiff but instead were sent by the Farmers' corporate office to the previous owner of French's property, unbeknownst to plaintiff.

14. At the time French was a District Manager for AFLAC.

15. Because French refused to be civil in spite of Cruz' repeated requests Cruz ultimately hung up on him.

16. Cruz's language and conduct was proper and followed good business practices given the circumstances.

17. French called back shortly thereafter and continued back into his harangue of plaintiff, without identifying himself this time either.

18. Cruz said that if the caller could not control himself and behave in a proper manner he should not call back again and then hung up on French.

19. At approximately 11:15 a.m. on January 19, 2017, Kandace Diekman, Cruz' assistant, received a phone call from Mr. French. Diekman is married to Cruz.

20. At the time of this call Cruz was not in the office.

21. Mr. French did not identify himself on this call either. He began to berate Ms. Diekman over the promotional materials being sent to him by Farmers, using loud harsh language that was laced with profanity.

22. At one point French threatened to come to the office to "fix things".

23. Based on that comment and as a result of French's general tone Ms. Diekman became afraid that French would come to the office and engage in a violent act toward her.

24. She made multiple requests that French speak to her in a civil matter but he did not comply.

25. Finally, after being further berated by French Ms. Diekman hung up on him.

26. At no point during her conversation with French did Diekman say anything about a gun.

27. Diekman then called Clint Sales, to discuss what had just happened.

28. Sales was the Farmers District Manager to which plaintiff directly reported.

29. Sales asked Diekman to send him an e-mail describing what had happened.

30. Diekman sent Sales an e-mail that day from Cruz's e-mail address describing what had happened. Because she had spoken with Sales and she was using Cruz' e-mail address she did not sign the e-mail.

31. In her e-mail Diekman made reference to French's threats to come to the office and "make us fix" the problem, his abusive language, calling her names, etc. She told Sales that she had said to French that she would call the police and hung up on French.

32. Diekman then closed by writing that she was not afraid and the agency would remain open and then went on to state that she carries, meaning she owns a gun and carries it with her, and that if she does feel threatened she "will blow a hole in him the size of Uganda." Diekman did not indicate in the e-mail that she had said anything to French about having a gun.

33. Diekman, having lived in the Greeley area for many years was well aware of the significant criminal activity that took place there.

34. She was also aware of a number of robberies that had taken place in the recent past.

35. Diekman's comments to Sales were simply venting but also a form of notice to Sales of French's erratic behavior and that she would protect herself.

36. Within a few hours of Diekman's e-mail Sales sent a request to Cruz to provide a timeline of the events.

37. Cruz responded within a half hour of the e-mail from his boss.

38. Cruz stated that he was not present on the day that French had spoken with Diekman.

39. Sales sent a response to Cruz asking if French had come in that day after the phone call.

40. Cruz responded that there had been no further word from the caller.

41. Later that day Sales sent an e-mail to Cruz providing an update regarding the irate caller situation. Curt Elsberry was copied on the e-mail.

6

42. The following morning (January 20, 2017) Cruz received a call from Elsbury, the Area Sales Manager for Farmers.

43. Elsbury was Sales' supervisor. Elsbury is Caucasian.

44. Elsbury started to speak in a condescending tone toward Cruz. He made accusations of unprofessional conduct toward Cruz about the phone calls with French without providing Cruz an opportunity to tell him what had happened.

45. On or about February 1, 2017 Elsbury sent Cruz a letter stating that no action would be taken regarding the Dan French incident even though it was the company's belief that Cruz had not acted properly. Cruz was cautioned not to let such a thing happen again.

46. On April 10, 2017 Sales called Diekman and told her that the company had decided to terminate plaintiff's contract with it based upon the Dan French incident.

47. Diekman was shocked and asked him why it was now a problem, when it had been addressed back in February with no follow-up.

48. Sales was apologetic toward her and Cruz about the company's decision.

49. Upon asking him why the Dan French incident was a problem now Sales told her that Elsbury had said he didn't want a "brown man running around the office with a gun."

50. On April 18, 2017, there was a conference call at which Sales, Elsbury, and plaintiff were in attendance.

51. At one point plaintiff brought up the fact that the letter of February 1 was being reversed which didn't make sense.

52. Elsbury said that the Dan French incident was a problem but did not explain why the company had changed its mind about the incident.

53. At that point Cruz said that he felt the decision was discriminatory given

7

Elsbury's comment about not wanting a brown man with a gun in a Farmers' office.

54. Elsbury did not deny making the statement.

55. At the time of the conference call Cruz had been in the process of trying to transfer the agency to his wife.

56. Cruz brought up this fact in the conversation and Elsbury said he would not allow that to proceed.

57. Elsbury did not have the power or authority to do that.

58. Cruz realized during the conversation that Elsbury actually thought the e-mail regarding the French incident describing a willingness to shoot someone who came to the office in an angry fashion had come from him and not from his wife.

59. Cruz tried to explain that the e-mail had come from Diekman.

60. Elsbury did not want to discuss it.

61. On or about July 12, 2017, Cruz received written notice that he was being terminated as an agent effective October 12, 2017.

62. No specific reasons were given for the termination of the relationship.

63. Cruz was given a right to appeal Farmers' decision.

64. Cruz timely filed his appeal.

65. Cruz' appeal was heard on August 1, 2017.

66. Cruz was not allowed to bring witnesses to the hearing on the appeal and he was not provided with any documentation Farmers claimed to have regarding the French incident or any of the other incidents it claimed to have relied upon in deciding to revoke his agency.

67. At the hearing Elsbury initially stuck to his story that it was Cruz who wrote the e-mail mentioning a gun.

8

68. However, during the hearing Elsbury was forced to acknowledge that he had known as of the date of the February letter that the e-mail had come from Cruz' wife.

69. Todd Brooks, a Colorado State Executive with Farmers was in attendance.

70. At one point when Elsbury claimed that he had called Cruz on a number of occasions but no one ever answered the phone Brooks asked Elsbury if he had actually left a message to which Elsbury said "no".

71. Brooks asked Elsbury why he hadn't left a message and Elsbury couldn't provide a legitimate answer.

72. Elsbury's testimony was false as there was someone in the office all the time from 9:00 a.m. to 4:30 p.m. and there was a voice mail system if the staff were on the phone or had left the office for the day.

73. One of the things that Elsbury focused on was that Cruz had been the recipient of a customer complaint approximately twenty years prior and that it was one of the reasons the company had lost faith in his abilities.

74. Relying on a 20 year old complaint was pretextual given plaintiff's longstanding relationship with Farmers and if it was such a big deal why was the February 1 letter issued by Elsbury?

75. Elsbury also claimed there were several other customer complaints but refused to provide Cruz with any details of the alleged complaints.

76. This is further evidence of pretext as the company should have provided plaintiff with some form of notice of the reasons he was being terminated. Without being given the chance to defend himself the hearing was just a token formality. It also was contrary to the February 1, 2017 letter.

9

77. Elsbury also claimed that the revocation was a liability issue as it pertained to the gun comment.

78. This is more evidence of pretext as Ms. Diekman's comment was a reasonable one given the context of what had happened with the threats from French. Additionally, when Farmers knew of the comment in January it did not make any effort to consult with Cruz about his wife possibly carrying a weapon with her to the office and then it issued the February 20 letter without even mentioning the subject. Furthermore, Farmers does not maintain any policy prohibiting its employees from carrying a firearm pursuant to and within the boundaries of state law.

79. On August 10, 2017 Cruz received the notice from the board upholding the decision to terminate his contract.

80. The committee even noted that there was a concern of the inconsistencies regarding the February 20 letter but decided to uphold the decision to revoke anyway.

81. This also constitutes evidence of pretext when a purportedly independent committee tasked with reviewing the evidence decided to uphold removing a contract that it had with someone for more than 30 years.

82. At the time of his termination Cruz was one of only two spanish speaking agents in the territory. The territory was made up predominantly of white males.

83. While Cruz was purportedly a contractor with Farmers it treated him with the control that established him as an employee pursuant to state law.

84. For instance, an agent had to have a location and it had to be approved by Farmers.

85. Farmers also required that any signage inside and outside the office to be

10

approved by Farmers.

86. The hours of operation were controlled by Farmers.

87. Farmers owned the rights, ownership, and continued ownership, if an agent was fired or died, of all the phone lines, fax #s and e-mail addresses.

88. The content and details of the voicemail messages were controlled at Farmers' direction.

89. Farmers controlled the entire computer system, including the ability to login.

90. Business cards, letterhead and all logos had to be approved by Farmers.

91. Farmers required attendance for meetings and training.

92. Farmers monitored the private insurance licensing information and kept track of renewals with the state and notified Cruz what would happen if there was not a timely renewal.

93. Farmers controlled acceptance of business, types of business cancellations, non-renewals, type of customers, and pricing of all products.

94. The ability to amend original contracts with customers, i.e. changes in coverage and deductibles was at Farmers' discretion.

95. An agent could not go outside Farmers for any business that they had an interest in.

96. Farmers owned a boat and RV insurance, classic car, trailer house company and bond company.

97. Farmers controlled who, what, why, and where, Cruz malpractice insurance was carried.

98. Farmers controlled the pay Cruz received.

99. Farmers required that agents sold policies that hurt their commissions by forcing

them to sell to Bristol, Foremost and Century 21.

100. Farmers deducted from Cruz' checks just as if he were an employee.

101. Farmers controlled Cruz' right to advertise and the methods used.

102. Farmers dictated the training to be provided to Cruz' staff.

103. Farmers sent different executives to Cruz' office to audit, oversee, implement changes, or inspect the premises, and report back to Farmers as to whether things met Farmers' guidelines.

104. Upon the revocation of Plaintiff's agency it was given to a male african-american.

## COUNT I

## 42 U.S.C. § 1981 VIOLATION – TERMINATION OF CONTRACT ON THE BASIS OF RACE

105. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 104 as though set forth fully herein.

106. Defendant's termination of plaintiff's contract was motivated by plaintiff's race in violation of 42 U.S.C. § 1981.

107. Defendant's act of terminating plaintiff on account of his race was intentional.

108. As a direct result of Defendant's intentional and unlawful actions in violation of 42 U.S.C. § 1981, plaintiff has suffered economic damages, emotional pain and distress, and has sustained a loss of benefits, and interest due thereon.

109. Defendant's actions were taken with malice and/or reckless indifference to plaintiff's federally protected civil rights under 42 U.S.C. § 1981, and plaintiff is therefore entitled to receive punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his favor:

(a) Awarding lost wages, including lost fringe benefits;

(b) Awarding compensatory damages;

(c) Awarding punitive damages;

(d) Order his reinstatement, or in the alternative, award front pay;

(e) Awarding the costs of this action, together with reasonable attorney's fees; and

(f) granting such other relief as the Court deems necessary and appropriate.

## COUNT II

### STATE LAW CLAIM FOR VIOLATION OF CADA – TERMINATION ON THE BASIS OF RACE

110. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 109 as though set forth fully herein.

111. Because of the amount of control exercised over plaintiff's business operations Plaintiff was an employee of Defendant.

112. Defendant's termination of plaintiff's employment was motivated by plaintiff's race in violation of CADA.

113. Defendant's termination of plaintiff's employment on the basis of his race was intentional.

114. As a direct result of Defendant's intentional and unlawful actions in violation of CADA, plaintiff has suffered economic damages, emotional pain and distress, and has sustained a loss of benefits, and interest due thereon.

115. Defendant's actions were taken with malice and/or reckless indifference to plaintiff's federally protected civil rights under CADA, and plaintiff is therefore entitled to receive an award of punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his

favor:

    (a)    Awarding lost wages, including lost fringe benefits;

    (b)    Awarding compensatory damages;

    (c)    Awarding punitive damages;

    (d)    Order his reinstatement, or in the alternative, award front pay;

    (e)    Awarding the costs of this action, together with reasonable attorney's fees; and

    (f)    granting such other relief as the Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated this 15th day of August, 2019.

                                            Respectfully submitted,

                              By:    *s/Ralph E. Lamar, Esq.*
                                          Ralph E. Lamar
                                          CO Attorney I.D. No. 44123
                                          8515 Braun Loop
                                          Arvada, CO 80005
                                          (303) 345-3600
                                          ralphlamar@ymail.com

                                          Attorney for Plaintiff