IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02337-MEH

MICHAEL CRUZ,

     Plaintiff,

v.

FARMERS INSURANCE EXCHANGE,
TRUCK INSURANCE EXCHANGE,
FIRE INSURANCE EXCHANGE,
MID-CENTURY INSURANCE COMPANY, and
FARMERS NEW WORLD LIFE INSURANCE COMPANY,

     Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

Plaintiff Michael Cruz ("Plaintiff") was an insurance agent for Defendants Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, and Farmers New World Life Insurance Company (collectively, "Defendants" or "Farmers"). Following the termination of Plaintiff's employment in October 2017, Plaintiff brought this suit, raising a claim under 42 U.S.C. § 1981 for race discrimination and a state law claim for breach of the implied covenant of good faith and fair dealing. Defendants have filed a motion for summary judgment ("Motion") as to all claims. ECF 51. The Court grants Defendants' Motion.

## FINDINGS OF MATERIAL FACT

The Court makes the following findings of material fact viewed in the light most favorable to Plaintiff, who is the non-moving party in this matter. For some facts, Plaintiff denies a fact

without any citation to evidence, which is not a proper denial, and the Court notes those instances. In his response, Plaintiff provides additional material undisputed facts, and the Court has incorporated those that it finds relevant and material.  The facts below are numbered consistent with Defendants' Motion.  When addressed elsewhere in this Order, the Court refers to these facts as the Findings of Material Fact ("FOMF").

1.      Defendants Mid-Century Insurance Company and Farmers New World Life Insurance Company are foreign corporations registered to do business in the State of Colorado. Exh. G, Declaration of Margaret Giles, at ¶¶ 3–4.

2.      Defendant Farmers Insurance Exchange, Defendant Truck Insurance Exchange and Defendant Fire Insurance Exchange are interinsurance exchanges organized under California law. *Id.* at ¶ 5.

3.      Insurance agents for Farmers are not employees of Farmers but are self-employed independent contractors.  Exh. A, Plt. Dep. at 18:23–19:1; Exh. B, Brooks Dep. at 22:16–18.

4.      On March 16, 1986, Plaintiff and Farmers entered into an Agent Appointment Agreement ("AAA") that governed his relationship with Farmers.  Exh. A at 17:9–18:14; Exh. H, Dep. Exh. 1.

5.      Plaintiff read, understood, and voluntarily signed the AAA.  Exh. A at 17:9–18:14; Exh. H.

6.      In Paragraph C, the AAA states that it is terminable at-will by either party by giving three months written notice:  "C. This Agreement . . . may be terminated by either the Agent or the Companies on three (3) months written notice."  Exh. H at 2; Exh. A at 19:2–19:20.

7.      Plaintiff understood that the AAA could be terminated by either party, with or without any reason, simply by giving three months written notice.  Exh. A at 19:2–19:20.

8.      The AAA also provides that it may be terminated on thirty days notice if one of the parties breaches any term of the AAA: "If the provisions of this Agreement are breached by either the Agent or the Companies, the Agreement may be terminated by the other party on thirty days written notice."  Exh. H at 2; Exh. A at 19:21–20:13.

9.      Plaintiff understood that the AAA could be terminated by either party on thirty days notice if the other party breached the AAA.  Exh. A at 19:21–20:13.

10.     During 2017 when the events at issue in this case occurred, the hierarchy at Farmers as it relates to the insurance agents included the following:

> a.      Above the insurance agents, Farmers had District Managers who—like the agents—were independent contractors.  *Id.* at 22:23–23:2; Exh. B at 21:24–22:7, 49:12–49:16; Exh. C, Kautz Dep., at 61:17–61:24.

> b.      Above the District Managers were Area Sales Managers who were employed by a Farmers-related entity.  Exh. B at 37:5–37:12.

> c.      Above the Area Sales Managers was a Head of Territory who was employed by a Farmers-related entity.  *Id.* at 37:5–37:16; Exh. D, Elsbury Dep., at 9:25–10:1.

> d.      Within the hierarchy was also a Territory Agency Manager who reported to the Head of Territory. Exh. D at 15:13–16:5; Exh. C at 8:6–8:19.

11.     In 2017, Clint Sales ("Sales") was the District Manager for the District in which Plaintiff operated his agency.  Exh. E, Sales Dep., at 10:11–10:23; Exh. A at 25:10–25:16.

12.     As District Manager, Sales was an independent contractor and did not have authority to terminate an agent's AAA.  Exh. E at 17:23–18:20; Exh. B at 21:24–22:7, 49:12–49:16; Exh. C at 61:17–61:24.

13.     From approximately 2015 until Farmers terminated Plaintiff's AAA in October 2017, Curt Elsbury ("Elsbury") was the Area Sales Manager and oversaw Colorado and Wyoming. Exh. D at 6:6–7:7; Exh. B at 37:17–37:20.

14.     From approximately 2015 until Farmers terminated Plaintiff's AAA, Todd Brooks ("Brooks") was the Head of the Mountain Territory which included Colorado.  Exh. B at 17:5–17:16.

15.     From approximately September 2016 until Farmers terminated Plaintiff's AAA, Chara Kautz ("Kautz") was the Territory Agency Manager in Colorado.  *Id.* at 23:4–23:12; Exh. C at 6:23–7:10.

16.     Kandace Diekman ("Diekman") worked as a Customer Service Representative at Plaintiff's agency and is Plaintiff's wife.  Exh. A at 19:2–19:20; Exh. F, Diekman Dep., at 10:3–10:4, 15:22–17:22, 19:3–19:23, 20:7–21:2; Exh. V, Dep. Exh. 27.

17.     As a party to the AAA, Plaintiff was responsible for the conduct of his employees—including Diekman.  Exh. A at 109:9–109:12.

**TERMINATION**

18.     On January 17, 2017, Greeley, Colorado resident Dan French ("French") called Plaintiff to request that Plaintiff remove him from a mailing list so that he would not continue to receive information from Plaintiff.  Exh. A at 48:14–50:7; Exh. I, Dep. Exh. 5.

19.     Following the call with Plaintiff, French emailed Roy Smith ("Smith") (then Farmers' President of Personal Lines and Distribution) complaining about Plaintiff's alleged unprofessional conduct during the call.  Exh. A at 53:20–54:1; Exh. I.

20.     French's email to Smith states, in relevant part:

I am writing to inform you that you are most certainly losing credibility in your branding in my community with Michael Cruz. . . .

4

> Michael has sent form letters to our home quarterly and semi-annually since 2001. These have all been addressed to the previous home owner. I have called his local office and spoken with his CSR each time and asked to have us removed from your list.
>
> Today I called again. He answered unprofessionally (no mention of "Farmers"), and I said again I'd like to have my address removed from his mailings. His voice raised and he repeated over and over very loudly "Who is this?" As soon as I told him who I was he hung up on me.
>
> I called back. This is when he used every four-letter word but golf. . . .
>
> I have filed a complaint with the Department of Regulatory Agencies in Colorado already.
>
> I can't imagine maintaining an appointment with this producer and expecting to grow my company's credibility in any market place.

Exh. I.

21.     Smith forwarded French's complaint to others with responsibilities for the Farmers agents, and it eventually made its way to Brooks.  Exh. B at 33:21–34:16, 35:4–35:17.

22.     Brooks enlisted the assistance of Elsbury and Sales to investigate the situation.  *Id.* at 37:24–39:7.

23.     On January 19, 2017, while Elsbury and Sales were in the process of conducting their investigation, French called Plaintiff's office again and spoke to Diekman.  Exh. A at 66:14–68:2; Exh. F at 43:7–44:20; Exh. J, Dep. Exh. 6, at 2–3.

24.     During this call, French stated that he was tired of getting mailings from Farmers and that if Plaintiff could not fix the problem, he would come to Plaintiff's office to make them fix the problem.  Exh. A at 66:14–68:2; Exh. F at 43:7–44:20; Exh. J at 2–3.

25.     On January 19, 2017, Diekman sent an email from Plaintiff's email account (mcruz@farmersagent.com) to Sales recapping her January 19 conversation with French.  Exh. A at 65:20–66:13, 68:3–68:13; Exh. F at 45:5–47:6; Exh. J at 2–3.

26.     At the end of her January 19, 2017 email to Sales, Diekman wrote, "I'm not afraid and [the office is] going to be open, I carry and if I feel threatened I will blow a hole in him the size of Uganda." Exh. A at 68:3–68:13; Exh. F at 45:5–47:6; Exh. J at 3.

27.     On February 1, 2017, Elsbury wrote a letter to Plaintiff outlining his investigation into French's complaint and stating, among other things:

> This is the second complaint we have on file for the agency in regards to unprofessionalism and inappropriate behavior. It is our expectation that all agents and their staff conduct themselves in a professional manner and represent the brand well within our local communities. No further action will be taken at this time, but I do want to remind you that any further incidents could jeopardize your agent appointment agreement.

Exh. A at 77:24–78:3; Exh. D at 31:6–31:10, 35:7–35:11; Exh K, Dep. Exh. 8.

28.     At the time Elsbury sent the February 1, 2017, letter, Brooks and Kautz were unaware of Diekman's statement in the January 19 email regarding carrying a gun and blowing a hole in someone the size of Uganda.[1] Exh. B at 49:1–49:11, 51:18–54:1, 55:3–55:19, 61:12–61:25; Exh. C at 14:16–16:4.

---

[1] Plaintiff denies the facts in paragraphs 28–30 on the basis that "when a defendant moves for summary judgment, even the *uncontradicted* testimony of interested witnesses supporting the employer, such as supervisors and other workers, should not be considered or otherwise weighed." Resp. at 3–4 (emphasis in original). Plaintiff cites *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149–51 (2000) for that proposition.  In describing the standard for reviewing evidence for a motion for judgment as a matter of law, the Supreme Court held in that case that, because the standards for that type of motion and motions of summary judgment are essentially the same, "[i]t therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all the evidence in the record." *Id.* at 150.  "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* Thus, a "court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 150–51 (citation omitted).  In describing this passage, the Tenth Circuit has held that "[i]n employment discrimination cases, the employer's agents frequently will supply the testimony, yet they cannot be deemed interested parties." *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 990 (10th Cir. 2012).  Here, the Court may (and does) consider the evidence submitted for Defendants' facts at paragraph 28 through 30.  Plaintiff does not cite to materials in the record

29.     Sometime in March or April 2017, Brooks and Kautz learned about Diekman's statement.  Exh. B at 49:1–49:11, 51:18–54:1, 55:3–55:19; Exh. C at 14:16–16:4.

30.     When Brooks and Kautz learned about Diekman's statement, they re-opened the matter to determine if further action was warranted regarding Plaintiff's AAA.  Exh. B at 49:1–49:11, 51:18–54:1, 55:3–55:19; Exh. C at 14:16–16:4; Exh. M, Dep. Exh. 11.

31.     On April 10, 2017, Elsbury notified Sales that Farmers was reviewing the possibility of terminating Plaintiff's AAA based on the French situation.  Exh. D at 39:14–39:17, 43:3–43:18; Exh. E at 53:14–54:10; Exh M; Exh. L, Dep. Exh. 9.

32.     On April 10, 2017, Sales called Diekman and told her that Farmers was reviewing the possibility of terminating Plaintiff's AAA based on the comment made in the January 19 email.  Exh. A at 94:2–95:14; Exh. F at 54:12–56:19; Exh. E at 53:14–54:10; Exh. M; Exh. L.

33.     Though the admissibility of the following comment is questioned, Diekman claims that during this April 10, 2017 telephone call Sales told her that Elsbury had told Sales that "they didn't want a brown man running around with a gun."  Exh. F at 54:25–55:2, 55:20–56:4.[2]

34.     Diekman never heard Elsbury make a comment about a "brown man with a gun."  Exh. F at 62:13–62:15.

35.     Plaintiff never heard Elsbury or Sales make any comment about a "brown man with a gun."  Exh. A at 98:25–99:17.

---

or demonstrate how the Defendants' cited evidence does not establish a genuine dispute of fact.  Fed. R. Civ. P. 56(c).  Accordingly, the Court finds the facts undisputed for purposes of summary judgment.

[2] The parties dispute whether Elsbury said "they didn't want" or "he didn't want."  *See* Exh. F at 56:2–56:19.  However, such distinction is immaterial since, as is described in this Order, the comment is inadmissible hearsay.

36.    On April 12, 2017, Elsbury sent Sales an email explaining Farmers' decision to review the French situation. Elsbury's email states:

> Per our conversation, at this time we are re-reviewing the situation between Michael Cruz and Dan French as it relates to the agreed upon terms attached to the Agency Appointment Agreement. As previously communicated, I'm happy to discuss this with Michael but was advised my request to set up a phone call was denied. Please let me know of any immediate questions.

*Id.* at 103:3–103:11, 103:24–105:15; Exh. D at 43:9–43:18; Exh. M.

37.    On April 12, 2017, Sales forwarded Elsbury's April 12th email to Plaintiff to provide him with an update on Farmers' decision to review the French situation.  Exh. A at 13:3–13:11, 103:24–105:15; Exh M.

38.    On April 14, 2017, Elsbury sent a memorandum to Kautz recommending the termination of Plaintiff's AAA on thirty days written notice based upon Plaintiff's violation of Paragraph J of the AAA requiring that he "conform to normal good business practice[s]."  Exh. D at 37:21–38:9; Exh. C at 33:13–34:12; Exh. N, Dep. Exh. 12.

39.    Kautz forwarded Elsbury's April 14, 2017 recommendation to terminate Plaintiff's AAA to Director of Home Office Agencies Robert Anderson ("Anderson") but requested permission to terminate the AAA on three months written notice instead of thirty days.  Exh. B at 23:16-23:21, 75:13–75:24; Exh. C at 36:12–36:15; Exh. W, Dep. Exh. 30, at 1.

40.    On July 3, 2017, Anderson approved of terminating Plaintiff's AAA on three months written notice pursuant to Paragraph C.  Exh. A at 121:6–121:24; Exh. B at 80:7–80:14; Exh. O, Dep. Exh. 14.

41.    On July 12, 2017, Farmers issued three months written notice to Plaintiff that it was terminating his AAA effective October 12, 2017.  Exh. A at 129:18–130:3; Exh. P, Dep. Exh. 16.

42.    The July 12, 2017, termination notice states, in part:

Your appointment agreement may be terminated on three months written notice. Please be advised that per paragraph C, the Companies are hereby terminating your appointment agreement on three months written notice. Accordingly, effective 10/12/2017, you will no longer represent, in any capacity, any of the Companies that are parties to your appointment agreement.

In addition, we have the following bases for termination: paragraph J by failing to conform to normal good business practice and to all local, State, and Federal laws governing the conduct of the Companies and their Agents.

Exh. P.

43.    With the exception of trying to schedule a meeting between Plaintiff and Elsbury in April 2017, Sales was not involved in either the recommendation or the actual decision to terminate Plaintiff's AAA.[3]  Exh. E at 53:14–54:10, 55:9–55:22, 59:22–60:3, 62:5–62:20.

**TERMINATION REVIEW BOARD**

44.    The AAA provides:

In the event this Agreement is terminated by the Companies, the Agent may within ten (10) days of receiving the notice of termination request a review of the termination by a termination review board.

The termination review board will be composed of:

1. An Agent of the Companies selected by the terminated Agent, such Agent must be a member of the President's Council from the same Region as the terminated Agent;

2. The Regional Manager or a representative of said Regional Manager;

3. A third party to be mutually selected by the other two members of the board.

The Review Board will convene within twenty (20) days of the request by the Agent at the Regional Office or such other convenient place selected by the Regional Manager. The Board will submit a summary of the hearing and its recommendations to the Executive Home Office. The chief executive officer and staff will review the summary and recommendations, reach a decision and promptly advise the Agent of that decision.

---

[3] Plaintiff makes the same objections as described in footnote 1 above.  For the same reasons, the Court considers this fact undisputed.

Exh. H at 2, ¶ D.

45.     Plaintiff requested a review of his termination by the Termination Review Board ("TRB").  Exh. Q, Dep. Exh. 18; Exh. A at 141:16–142:13.

46.     From the list of President's Council agents, Plaintiff selected Mike Schmisek, whom he knew, to sit on the TRB.  Exh. A at 146:5–146:25, 147:18–147:24; Exh. B at 33:5–33:9; Exh. R, Dep. Exh. 20.

47.     Brooks, as Head of the Mountain Territory, also sat on the TRB as required by the AAA.  Exh. A at 147:18–148:3; Exh. B at 24:25–25:23; Exh. H at 2; Exh. R.

48.     Brooks and Schmisek mutually selected Attorney Gregg Kay as the third member of the TRB.  Exh. A at 147:18–148:6; Exh. B at 33:5–33:15; Exh. H at 2; Exh. T, Dep. Exh. 22.

49.     On August 1, 2017, the TRB convened to review the termination of Plaintiff's AAA.  Exh. A at 147:1–4, 152:14–152:23, 153:3–6; Exh. R; Exh. T; Exh. X, Dep. Exh. 36, at 1.

50.     At the TRB, Plaintiff was represented by his own counsel and given an opportunity to present any and all information he wanted to present in support of his position that the AAA should not be terminated.[4]  Exh. A at 152:14–152:20.

51.     At no point during the TRB did Plaintiff, Diekman, or Plaintiff's attorney make any reference to Elsbury's alleged comment about a "crazy brown man with a gun."  *Id.* at 152:14–153:22; Exh. F at 77:10–77:15; Exh. S, Dep. Exh. 21.

52.     At the conclusion of the TRB hearing, the three member panel unanimously agreed to uphold the termination of Plaintiff's AAA on three months written notice.  Exh. A at 158:15–159:3; Exh. T.

---

[4] Plaintiff indicates that this fact is denied but does not support that denial with any citation to the record.  Resp. at 4, ¶ 50; *see* Fed. R. Civ. P. 56(c).

53.     On August 11, 2017, Farmers sent a letter to Plaintiff advising him that it had affirmed the TRB's recommendation:

> In accordance with your appointment agreement, the Termination Review Board has submitted a summary of the proceeding and its recommendation to the Home Office for review. After such review, it was concluded to uphold the decision to terminate your appointment agreement.

Exh. A at 159:7–13; Exh. U, Dep. Exh. 23.

54.     Plaintiff has no information or knowledge that his race was a factor of any kind in Elsbury's decision to issue him the February 1, 2017 letter.  Exh. A at 90:20–24.[5]

55.     Plaintiff has no information or knowledge that his race was a factor of any kind in Elsbury's April 14, 2017 recommendation to terminate his AAA other than Diekman telling Plaintiff that Sales had told her that Elsbury made a comment about a brown man with a gun.  *Id.* at 110:18–111:1.

56.     Plaintiff has no information or knowledge that his race was a factor of any kind in Anderson's July 3, 2017 decision to approve of the termination of Plaintiff's AAA.  *Id.* at 122:8–122:16.

---

[5] Plaintiff objects to facts 54 through 58 on two grounds.  First, pursuant to the Supreme Court's holding in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1963), Plaintiff is not required to know or understand the elements of his case.  The Court finds that these facts do not concern Plaintiff's legal knowledge of his case.  These facts squarely deal with what Plaintiff understood in terms of racial animus or prejudice that he felt against him.  His lack of any information or knowledge that race was a factor in Defendants' decision to terminate (absent the two actions mentioned elsewhere in the facts) is material to the case and does not at all concern Plaintiff's legal knowledge.  Second, Plaintiff objects because Plaintiff "was the first individual deposed and information was discovered throughout the course of the case that supports [his] case that he was not aware of at the time of his deposition."  Resp. at 4.  This may be true, but Plaintiff does not support this objection with any citation to the record.  *See* Fed. R. Civ. P. 56(c).  Moreover, the Court has considered all evidence, so any prejudice to Plaintiff in being the first individual deposed is greatly reduced.

57.     Plaintiff has no information or knowledge that his race was a factor of any kind in the TRB's decision to uphold the termination of his AAA.  *Id.* at 159:14–160:3.

58.     Plaintiff has no information or knowledge that his race was a factor of any kind in Defendants' decision to terminate his AAA other than (a) his subjective belief that Elsbury "talked down" to him and (b) Diekman telling Plaintiff that Sales had told her that Elsubry made a comment about a brown man with a  gun.  *Id.* at 137:25–138:10.

59.     Plaintiff is unaware of any other agent at Farmers whose contract was not terminated when the agent or the agent's staff made a threatening comment.  Exh. A at 162:7–163:2.

60.     The only provision in the AAA Plaintiff contends conferred discretion upon Farmers to support his claim for breach of the duty of good faith and dealing is Paragraph J which reads, in part, "The Agent shall, as an independent contractor, exercise sole right to determine the time, place and manner in which the objectives of this Agreement are carried out, provide only that the Agent conform to normal good business practices, and to all State and Federal law governing the conduct of the Companies and their Agents."  ECF 43, Second Amended Complaint at ¶¶ 67–69, 102.

61.     Plaintiff admits that Diekman's January 19, 2017 email was not appropriate.  Exh. A at 68:3–16.

62.     Plaintiff agrees that Diekman's January 19, 2017 email violated Paragraph J of the AAA.  *Id.* at 109:13–109:19.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  A court shall grant summary

judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).  "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment."  *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)).  Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment.  *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322.  That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); see also *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by

any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting Celotex, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)).  "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Plaintiff brings two claims against Defendants.  First, he asserts a racial discrimination claim pursuant to 42 U.S.C. § 1981.  Second, he alleges a breach of the implied covenant of good faith and fair dealing.  Defendants seek summary judgment on both claims.

## I.    Section 1981 Race Claim

"Section 1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995) (quoting 42 U.S.C. § 1981).  "A plaintiff suing under Section 1981 must prove that race was a but-for cause of his injury." *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 589 U.S. –, 140 S.Ct. 1009, 1016–17 (2020).  In doing so, a plaintiff may show intentional discrimination through the use of either direct or indirect evidence. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1225–26 (10th Cir. 2000).

Courts analyze claims under Section 1981 using the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Carney v. City & Cty. Of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008). Under this framework, the plaintiff has the initial burden to establish a prima facie case of discrimination. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). If the plaintiff establishes a prima facie case, "the burden shifts to the employer to proffer 'a legitimate non-discriminatory purpose for the adverse employment action.'" *Id.* at 1216–17 (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)). "If the defendant meets this burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretext." *Orr*, 417 F.3d at 1149; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (stating that under the third step of the *McDonnell Douglas* framework, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination").

A.      **Prima Facie Case**

"To establish a § 1981 claim, a plaintiff must show that: (1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; (3) the discrimination interfered with a protected activity as defined in Section 1981, i.e., the making or enforcing of a contract." *Kelley v. New York Life Ins. & Annuity Corp.*, No. 07-cv-01702-LTB-BNB, 2008 WL 1782647, at *4 (D. Colo. Apr. 17, 2008) (citing *Hampton v. Dillard Dep't. Stores, Inc.*, 247 F.3d 1091, 1101–02 (10th Cir. 2001)). Defendants challenge Plaintiff's prima facie case on the second prong, namely that "he cannot establish that [Defendants] had an 'intent to discriminate' against him on the basis of race." Mot. at 23.

15

1.   <u>Direct Evidence</u>

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption."  *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007).  Defendants contend, and Plaintiff does not dispute, that the only possible direct evidence in this matter is Sales' comment regarding a "crazy brown man running around with a gun." Defendants argue that this statement is inadmissible hearsay.  Mot. at 18.  The parties dispute whether the statement is excluded from the general prohibition against hearsay under Fed. R. Evid. 801(d)(2)(D).  Pursuant to that Rule, a statement is not hearsay if "[t]he statement is offered against an opposing party and: . . . (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

Defendants challenge the admissibility of the statement primarily on two grounds.  First, that the statement is not a party-opponent admission because Sales is an independent contractor. Mot. at 21.  Second, Sales was not involved in the decision-making process to terminate Plaintiff's AAA.  *Id.*  The Court finds these arguments inextricably related, so it will address them jointly.

"[I]n the Tenth Circuit, an employee's statements are not attributable to his employer as a party-opponent admission in an employment dispute unless the employee was involved in the decisionmaking [sic] process affecting the employment action at issue."  *Romero v. Helmerich & Payne Int'l Drilling Co.*, 2016 WL 11692094, at *7 (D. Colo. Oct. 13, 2016) (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010) (internal quotation marks and citation omitted)); *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303 (10th Cir. 2005) ("In order for a statement to qualify as an admission of a party opponent, the speaker 'must be involved in the decisionmaking [sic] process affecting the employment action involved.").  Here, it is undisputed

that Sales did not have ultimate decision-making authority over Plaintiff.  *E.g.*, FOMF at ¶ 43.

Under Tenth Circuit precedent, Sales' comment is thus inadmissible hearsay.

To rebut that conclusion, Plaintiff cites *Aliotta v. Nat. Railroad Passenger Corp.*, 315 F.3d

756 (7th Cir. 2003) in support of his argument that Sales had sufficient authority over him to

attribute the statement as an admission by a party-opponent.  Specifically, Plaintiff points to the

following language from *Aliotta*:

> Rule 801(d)(2)(D) admissions can be made "concerning [*any*] matter within the
> scope of the . . . employment."  *See* Fed. R. Evid. 801 advisory committee note,
> 1972 Proposed (noting that since "few principals employ agents for the purpose of
> making damaging statements," admissible admissions may be made as to all
> matters within the scope of the agency or employment and include more than just
> statements made in circumstances meeting "the usual test of agency").

*Id.* at 762.

The Tenth Circuit has faced similar arguments by a plaintiff arguing that *Aliotta* should

apply instead of *Johnson* and *Jaramillo*.  *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1202–

03 (10th Cir. 2015).  The court found the attempt to apply *Aliotta*'s standard irrelevant, since "the

court in that case clearly determined that the subject matter of the admission [must] match the

subject matter of the employee's job description."  *Id.* at 1203 (internal quotation marks and

citation omitted).  Therefore, even if this Court were to agree with Plaintiff and apply *Aliotta* in

this case, the subject matters of Sales' job and the statement must match.  As to Sales' job

description, Plaintiff has admitted that Sales "was an independent contractor and did not have

authority to terminate an agent's AAA."  Resp. at 3; Mot. at 5, ¶ 12.  Additionally, the Court found

as an undisputed material fact that, "[w]ith the exception of trying to schedule a meeting between

Plaintiff and Elsbury in April 2017, Sales was not involved in either the recommendation or the actual decision to terminate Plaintiff's AAA."[6]  FOMF at ¶ 43.

The Court also adds that Plaintiff admits that he is not an employee of Defendants but rather a self-employed independent contractor.  Resp. at 3; Mot. at 2, ¶ 3.  From these facts, the Court determines that Sales' job description did not include any authority over Plaintiff's employment. As such, Sales' alleged comment that "they didn't want a crazy brown man running around with a gun" does not match the subject matter of his employment since "they" could not have included Sales.  *Ellis*, 779 F.3d at 1202–03.

Accordingly, under *Johnson* and *Jaramillo*, Sales' remark is not an admission by a party opponent.  Consequently, it is hearsay and may not be considered by the Court as evidence.  As a final note, Plaintiff argues that should the Court find that Sales was not involved in the decision-making process, that the Court should find the Tenth Circuit's holding in *Johnson* as "an unwarranted and improper revision of the Federal Rules of Evidence."  Resp. at 24.  The Court will not do so here.

### 2.    Indirect Evidence

Plaintiff contends that even if there is no direct evidence, "[c]ircumstantial evidence suffices to establish a prima facie case."  Resp. at 25.  The Court notes that Plaintiff's circumstantial evidence includes things he described in his Statement of Additional Facts.  While viewing all facts in light most favorable to Plaintiff, the Court only considers those which are undisputed and material.

---

[6] As additional support, Defendants direct the Court to *Merrick v. Farmers Ins. Group*, a Ninth Circuit case that has addressed the issue of whether a Farmers' District Manager is an independent contractor.  892 F.2d 1434 (9th Cir. 1990).  In that case, the court found that the plaintiff did not meet his burden of establishing that Defendants' insurance agents and the district manager were "agents" of Defendants' as opposed to independent contractors.

Defendants argue that Plaintiff fails to establish the second prong of a prima facie case, namely whether there was an intent to discriminate on the basis of race.  Mot. at 22–23.  Plaintiff responds that "there is sufficient evidence to establish that [Plaintiff's] race was a but-for factor in [Defendants'] decision."  Resp. at 25.

The undisputed facts show that on January 19, 2017, Diekman sent an email from Plaintiff's email account to Sales describing her conversation with French.  FOMF at ¶ 25.  In that email, Diekman stated, "I'm not afraid and [the office is] going to be open, I carry and if I feel threatened I will blow a hole in him the size of Uganda." *Id.* at ¶ 26.  Plaintiff was not initially disciplined. *Id.* at ¶ 27.  Brooks (Head of Mountain Territory) and Kautz (Territory Agency Manager) did not know of Diekman's statement until March or April 2017. *Id.* at ¶ 29.  When they learned of the statement, they revisited the matter to decide if further action was appropriate. *Id.* at ¶ 30.  On July 3, 2017, Farmers' Home Office, after reviewing the situation, approved the termination of Plaintiff's AAA on three months written notice based on the email. *Id.* at ¶¶ 38–40.

Plaintiff relies primarily on three assertions to support his case of discrimination.  First, Plaintiff has the subjective belief that Elsbury "talked down to [him] and was condescending to [him] because [he is] Hispanic." *Id.* at ¶ 58.  However, "[a] plaintiff's subjective belief that he was discriminated against is insufficient to demonstrate discrimination and does not preclude summary judgment." *Ouedraogo v. Downtown Bus. Improvement Dist.*, No. 12-cv-01373-JLK, 2014 WL 559962, at *8 (D. Colo. Feb. 13, 2014) (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408–09 (10th Cir. 1997)).  In other words, there must be more evidence to support the claim than just Plaintiff's subjective belief.

Second, Plaintiff emphasizes his belief that the switch in Defendants' decision regarding Plaintiff's termination constitutes evidence of an intent to discriminate.  Resp. at 26.  As described

above, though, it is undisputed that Defendants revisited Plaintiff's disciplinary action only after Brook and Kautz learned of Diekman's statement.  Plaintiff admits Diekman's email violated the AAA.  FOMF at ¶ 62.  The Court finds no admissible evidence in the record to suggest that race played any part in the revisiting of Plaintiff's discipline.  Also, Plaintiff cites no caselaw in which such a switch constitutes evidence of an intent to discriminate.

Third, Plaintiff cites extensively to his Statement of Additional Material Facts for the notion that Defendants operated on the belief that Diekman's email was sent by Plaintiff.  Resp. at 25–27.  For example, Plaintiff alleges that "Kautz changed the narrative from Diekman to Cruz as being the author of the e-mail." *Id.* at 26.  The Court has found such allegations to be unsupported by the record (and thus controverted) or immaterial.  Moreover, it is undisputed that Diekman sent the email and that Defendants made the decision to terminate the AAA on the knowledge that she sent it.  FOMF at ¶¶ 25, 29, 32.  In fact, Elsbury's memorandum to Kautz requesting termination of Plaintiff's AAA specifies that the email came from Plaintiff's account, not from him directly.  Exh. N at Farmers 0065.

Plaintiff has admitted that he has no information or knowledge that his race was a factor in Elsbury's decision to issue the February 1, 2017 letter, Elsbury's April 14, 2017 recommendation to terminate his AAA, Anderson's July 3, 2017 decision to approve the termination of the AAA, and the TRB's decision to uphold the termination.  FOMF at ¶¶ 54–57.  Plaintiff cannot rely on Sales' comment since it is inadmissible hearsay.  As a result, Plaintiff is left with his subjective belief that he was discriminated against based on his race.  That cannot be the sole basis for a Section 1981 claim. *Ouedraogo*, 2014 WL 559962, at *8.  Therefore, the Court finds that summary judgment in favor of Defendants is appropriate for the lack of admissible evidence showing an intent to discriminate.

###### B.    Legitimate Non-Discriminatory Purpose

Assuming that Plaintiff did present evidence of an intent to discriminate, the Court will consider whether Defendants proffered a legitimate non-discriminatory purpose in its decision to terminate and whether such a purpose was pretext for discrimination.  Here, the Court finds that Defendants have met their burden of demonstrating a legitimate non-discriminatory purpose for terminating Plaintiff.  Defendants acted pursuant to Paragraph C of the AAA which permits either party to terminate it at-will.  FOMF at ¶ 40.  In addition, Defendants have pointed to Plaintiff's violation of Paragraph J of the AAA as a stated reason for termination.  *Id.* at ¶ 38.  Plaintiff even admits that Diekman's email constituted a violation of the AAA.  *Id.* at ¶ 62.

###### C.    Pretext

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Lobato v. New Mexico Environment Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997)) (internal quotation marks omitted).  In this Circuit, a demonstration of pretext usually takes one of three forms:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick*, 220 F.3d at 1230.  Here, Plaintiff focuses primarily on the basis of Defendants' stated reasons being false.

Plaintiff admits that Diekman's email violated Paragraph J of the AAA. FOMF at ¶ 62. Plaintiff argues that "a small slap on the wrist to [him] in February was the proper response[,]" but argues that when the "company higher-ups" got involved, the situation turned into one of racial animus. Resp. at 29. As already discussed, the Court finds that the "company higher-ups" did not have notice of the specific content of Diekman's email until March or April 2017. FOMF at ¶ 29. Once discovered, the matter was reopened for review. *Id.* at ¶ 30. Regardless, "[e]vidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 948 (10th Cir. 2011) (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169–70 (10th Cir. 2007)). The Court does not look simply to the severity of the punishment but rather to the honesty of the proffered reasons for the action. *Young v. Dillon Cos., Ins.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("The relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.").

Plaintiff also argues that the "about face" itself constitutes pretext. Mot. at 29–30. The Court has already addressed this point; namely, the "about face" is explained by Brooks and Kautz not knowing about Diekman's comment until March or April 2017. Anything that happened before that (e.g., the February 1 disciplinary memo) occurred without the "higher-ups" knowing the full picture. The Court cannot find pretext on that alone.

Finally, Plaintiff alleges pretext in that Plaintiff was assumed to have sent the threatening email. For example, Plaintiff points to Kautz' statements in her email to Anderson which show that Defendant was operating under the impression that Plaintiff had sent the threatening email. Resp. at 33–34. As the Court has already addressed, though, the uncontroverted evidence shows

that Plaintiff was fired with the knowledge that Diekman had sent the email.  *E.g.*, FOMF at ¶ 30. While there may have been some initial confusion over who sent the email, Defendants did not use the pretext that Plaintiff had sent the email in their decision to terminate.

Even if Plaintiff could demonstrate this was untrue, there must still be enough evidence to find "that *discrimination was a determinative factor* in the employer's actions."  *Young*, 468 F.3d at 1250 (emphasis in original).  Absent the "brown man" comment (which is hearsay) and Plaintiff's subjective belief of discrimination (which alone is insufficient evidence), the record is devoid of evidence of discrimination.  The Court cannot find that Defendants' legitimate reason for termination was pretext for some discriminatory purpose.  As a result, there is simply no basis on which the Court can conclude that race was a but-for cause in the decision to terminate Plaintiff's AAA.  *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. __, 140 S.Ct. 1731, 1739 (2020). Accordingly, Defendants are entitled to summary judgment on this claim.

## II.     Supplemental Jurisdiction

Having granted summary judgment on the only federal claim in this case, the Court must now consider whether it has jurisdiction over the remaining state law claim.  Pursuant to 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III."  Here, the parties' dispute squarely concerns the termination of Plaintiff's AAA.  The Court finds that Plaintiff's state law claim for breach of the implied covenant of good faith and fair dealing forms part of the same case and controversy as Plaintiff's federal claim.

A federal court may decline to exercise supplemental jurisdiction over remaining state law claims if the principles of comity and federalism favor litigating them in state court. *See Marquez*

*v. Harvest Standard, LLC*, No. 09-cv-02584-PAB-MJW, 2011 WL 1755265, at *1 (D. Colo. 2011).   However, countervailing reasons of judicial economy, convenience, and fairness to the litigants may compel a federal court to exercise supplement jurisdiction to keep state law claims. *See Bauchman v. West High School*, 132 F.3d 542, 549 (10th Cir. 1997). Having weighed the competing factors, the Court finds that it should exercise supplemental jurisdiction over the remaining state law claim. The parties already have expended a great deal of time and energy litigating in federal court. Discovery is over, and the pending summary judgment motion covers all of Plaintiff's claims.  Moreover, no party has argued against asserting jurisdiction.

## III.   <u>Good Faith and Fair Dealing</u>

Under Colorado law, "every contract contains an implied covenant of good faith and fair dealing." *Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J*, 940 P.2d 348, 251 (Colo. 1997).   Yet, when the contract at issue provides for termination without cause, the implied covenant does not apply.  *Grossman v. Columbine Medical Grp., Inc.*, 12 P.3d 269, 271 (Colo. App. 1999) ("[T]he termination clause expressly sets forth the right of both parties to terminate the contract for any reason.  Hence, the [party] cannot rely on the implied duty of good faith and fair dealing to circumvent terms for which he expressly bargained."); *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 623 (Colo. App. 1997) (the implied covenant "cannot limit an employer's right to discharge without cause, unless there is an express or implied promise, independent of the covenant of good faith itself, restricting that right").

Plaintiff does not cite law to the contrary but argues instead that this Court already considered whether the implied covenant of good faith and fair dealing applies in connection with Defendants' partial motion to dismiss.  Resp. at 35 (citing ECF 39).  Indeed, Defendants moved to dismiss this claim pursuant to Fed. R. Civ. P. 12(b)(6), and the Court denied the motion.  ECF 39.

However, the Court did so on the basis that "the case presents a factual dispute regarding the manner in which the underlying contract was terminated." *Id.* at 1. The Court explicitly recognized that "Colorado state and federal courts have held that the implied covenant is inapplicable to a clause expressly permitting one party to terminate the contract without cause." *Id.* at 2 (quoting *Eagle Sys. & Servs., Inc.v. Exelis Sys. Corp.*, No. 12-cv-00303-RBJ, 2015 WL 59315, at *3 (D. Colo. Jan. 2, 2015) (citing cases)).

The undisputed facts demonstrate that Paragraph C allows either Plaintiff or Defendants to terminate the AAA at-will "on three (3) months written notice." Exh. H at Farmers 0108. Elsbury's April 14, 2017 recommendation to terminate Plaintiff's AAA requested permission to terminate the AAA on three months written notice. FOMF at ¶ 39. Anderson approved the termination of Plaintiff's AAA on three months written notice pursuant to Paragraph C. *Id.* at ¶ 40. On July 12, 2017, Defendant issued the three months written notice to Plaintiff. *Id.* at ¶ 41.

Unlike with the motion to dismiss, there is no factual dispute as to the nature of Plaintiff's termination. While Defendants cite to violation of Paragraph J for justification, Defendants terminated Plaintiff's AAA pursuant to the at-will clause in Paragraph C. When the clause at issue provides for termination without cause, the implied covenant of good faith and fair dealing is inapplicable. *Grossman*, 12 P.3d at 271. Therefore, as a matter of law, Defendants are entitled to summary judgment on this claim.[7]

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants' Motion [filed September 4, 2020; ECF 51] is **granted**. The Court directs the Clerk of the Court to enter judgment in Defendants' favor and to close this case.

---

[7] In so ruling, the Court does not address Defendants' other arguments on this claim.

Entered this 28th day of January, 2021, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge